STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
VICTOR VINEGRA, DEFENDANT-APPELLANT.

Argued September 13, 1976—Decided June 30, 1977.

Mr. *Michael D. Schottland* argued the cause for defendant-appellant (*Messrs. Chamlin, Schottland & Rosen,* attorneys; *Mr. Thomas W. Cavanagh, Jr.* and *Mr. Schottland,* on the brief).

Mr. *John DeCicco,* Deputy Attorney General, argued the cause for plaintiff-respondent (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Peter N. Gilbreth,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

SULLIVAN, J. Defendant, Victor Vinegra, then the City Engineer of Elizabeth, was called before a Union County grand jury which was making an inquiry into official misconduct in Elizabeth involving a street improvement project. He was questioned before the grand jury without being advised of the scope of the investigation or that he was a possible target of the inquiry. Also, he was not told of his privilege against self-incrimination or his right to testimonial immunity under *N. J. S. A.* 2A:81–17.2a2. It is undisputed that defendant, in his appearance before the grand jury, did not assert his privilege against compulsory self-incrimination. Following his extensive testimony before the grand jury, defendant and one Harry E. Allen (not involved in this appeal) were charged with criminal conduct by the same grand jury which returned a nine-count indictment against them on June 29, 1973. Eight of the counts involve defendant. The first seven charge him with misconduct in office and conspiracy; the eighth count charges false swearing before the grand jury.

On April 11, 1974 the trial court granted in part a motion made by defendant and dismissed the first seven counts of the indictment as to him. It refused to dismiss the eighth count which charged defendant with false swearing. See *N. J. S. A.* 2A:81–17.2a2; *State v. Mullen,* 67 *N. J.* 134 (1975). The trial court found that defendant was a target of the grand jury investigation and that there had been a failure to inform him of the scope of the investigation or to warn him of his privilege against self-incrimination. It held that this was a violation of defendant's Fifth Amendment rights and, relying on *State v. Fary,* 19 *N. J.* 431 (1955), *State v. Sarcone,* 96 *N. J. Super.* 501 (Law Div. 1967) and *State v. Rosania,* 96 *N. J. Super.* 515 (Law Div. 1967), ordered that counts one through seven be dismissed.

On leave granted to appeal, the Appellate Division held that there was sufficient evidence to justify the factual findings made by the trial judge. However, it disagreed with his

conclusion that dismissal of the charges was required. Instead, the Appellate Division held that defendant's Fifth Amendment rights were adequately protected by virtue of *N. J. S. A.* 2A:81–17.2a2 which provided that if any public employee

* * * testifies before any * * * grand jury * * *, such testimony and the evidence derived therefrom shall not be used against such public employee in a subsequent criminal proceeding under the laws of this State.

Although defendant had not claimed privilege or been informed of such statutory immunity when he appeared before the grand jury, the Appellate Division held that the statute was "self-executing" and required no assertion of privilege by the witness and no confirmatory action by the court or by the State.[1]

The Appellate Division held that by virtue of *N. J. S. A.* 2A:81–17.2a2, defendant's testimony before the grand jury could not be used against him in any subsequent criminal proceeding except as it might be relevant in a prosecution for perjury or false swearing. *State v. Mullen, supra.* This statutory immunity, the Appellate Division held, adequately protected defendant's Fifth Amendment rights so that dismissal of the indictment was not warranted. It therefore reinstated counts one through seven. This Court granted defendant's motion for leave to appeal.

The United States Supreme Court, in similar factual circumstances, has held that, insofar as a violation of the Fifth Amendment privilege against self-incrimination is involved, the remedy is not dismissal of the indictment but rather suppression of the grand jury testimony and its fruits should

---

[1]The statute was amended by L. 1975, c. 246 so as to limit the grant of immunity to a situation where the public employee testifies after having first claimed the privilege against self-incrimination and having then been informed that his failure to appear and testify will subject him to removal from his office, position or employment.

the Government seek to use it at trial. *United States v. Blue,* 384 *U. S.* 251, 86 *S. Ct.* 1416, 16 *L. Ed.* 2d 510 (1966); *United States v. Calandra,* 414 *U. S.* 338, 94 *S. Ct.* 613, 38 *L. Ed.* 2d 561 (1974). See, *Kastigar v. United States,* 406 *U. S.* 441, 92 *S. Ct.* 1653, 32 *L. Ed.* 2d 212 (1972), reh. den. 408 *U. S.* 931, 92 *S. Ct.* 2478, 33 *L. Ed.* 2d 345 (1972); *United States v. Mandujuano,* 425 *U. S.* 564, 96 *S. Ct.* 1768, 48 *L. Ed.* 2d 212 (1976).

When a witness appears before a grand jury, as a general rule, he does not have the status of a defendant in a criminal trial and it is not required that he be informed of the privilege against compulsory self-incrimination. *State v. Fary, supra,* 19 *N. J.* at 435. The failure to warn such a witness of his right to refuse to answer incriminating questions has a bearing on the matter of invasion of his privilege, only if the witness was under formal criminal charges at the time and was questioned as to the charges, or, though not under formal charges, the grand jury proceeding was not a general inquiry but one directed at the witness with the object of returning an indictment against him. *State v. Browning,* 19 *N. J.* 424, 427 (1955).

This court has not had occasion to rule directly on the question whether a "target" of a grand jury proceeding must be advised that he is a target and of his right not to incriminate himself, failing which an indictment based on his testimony will be quashed. However, we have in numerous decisions approved this principle. *State v. Williams,* 59 *N. J.* 493, 503 (1971); *In re Addonizio,* 53 *N. J.* 107, 117 (1968); *State v. DeCola,* 33 *N. J.* 335, 342–344 (1960); *State v. Browning, supra; State v. Fary, supra.* Trial courts have uniformly adhered to the target rule. *State v. Sibilia,* 88 *N. J. Super.* 546 (Essex Cty. Ct. 1965); *State v. Sarcone, supra; State v. Rosania, supra.*

This principle grows out of the privilege against self-incrimination in this State which, although not written into our State Constitution, is firmly established as part of our common law. *State v. Deatore,* 70 *N. J.* 100 (1976); *In re*

*Pillo,* 11 *N. J.* 8 (1952); *State v. Zdanowicz,* 69 *N. J. L.* 619 (E. & A. 1903). The privilege is now also incorporated in our Rules of Evidence, *N. J. S. A.* 2A:84A–1 *et seq.;* see *Evid. R.* 23, 24 and 25. However, for reasons which follow, we need not in this particular case, resolve the question whether we should continue to adhere to the "target" principle as part of our common law privilege against self-incrimination.

The target doctrine, insofar as it calls for dismissal of the indictment against a target witness, has been modified to some extent as to public employees by legislative action heretofore referred to. In 1970 a statute was enacted making it the duty of every public employee to appear and testify upon matters directly related to the conduct of his office and subjecting him to removal if he failed to do so. *N. J. S. A.* 2A:81-17.2a2.[2] The statute also provides that such testimony and the evidence derived therefrom shall not be used against such public employee in a subsequent criminal proceeding under the laws of this State. *N. J. S. A.* 2A:81–17.2a2. Recent amendments not here pertinent are referred to in footnote 1, *supra.*

This statute has the effect of making the target doctrine inapplicable to a public employee insofar as it imposes a duty on him to testify upon matters directly related to the conduct of his office. At the same time it seeks to protect his privilege against self-incrimination by giving him the use and fruits immunity heretofore referred to.

---

[2]This statute was enacted in response to the decision of the United States Supreme Court in *Gardner v. Broderick,* 392 *U. S.* 273, 88 *S. Ct.* 1913, 20 *L. Ed.* 2d 1082 (1968) which, in effect, held that a public employee can be put to the choice of answering questions specifically, directly and narrowly relating to the performance of his official duties, or facing loss of his job, provided he is not required to waive his immunity with respect to the use of his answers or the fruits thereof in a subsequent criminal prosecution. See also, *Garrity v. New Jersey,* 385 *U. S.* 493, 87 *S. Ct.* 616, 17 *L. Ed.* 2d 562 (1967); *Sanitation Men Asso. v. Commissioner,* 392 *U. S.* 280, 88 *S. Ct.* 1917, 20 *L. Ed.* 2d 1089 (1968).

Defendant argues that the immunity conferred by the statute is an inadequate protection of his Fifth Amendment and common law privilege against self-incrimination. He notes that the immunity granted only extends to use of such testimony in a subsequent criminal proceeding and that the grand jury which heard such testimony would be free to use it to indict him.

So far as the Fifth Amendment is involved, the United States Supreme Court has consistently held that the receipt by a grand jury of evidence obtained in violation of a person's Fifth Amendment rights does not infect an indictment based on such testimony. *Blue, supra; Calandra, supra.* As noted, these cases hold that suppression of such grand jury evidence (and fruits thereof) at trial adequately protects a defendant's Fifth Amendment rights.

The common law privilege against self-incrimination in New Jersey as expounded in our target doctrine seems to afford greater protection than that given by the Fifth Amendment. However, the privilege and doctrine stem from the common law and are subject to legislative modification.

■ Concededly the statute in question takes away from a certain class of the citizenry the protection of the target doctrine to the extent that it imposes a duty on a public employee to testify upon matters directly related to the conduct of his office. However, it cannot be said that the statutory classification is arbitrary and unreasonable or denies equal protection in the constitutional sense. A public employee attends to the business of government. It is the public's right and in the public interest to require such employee to account for his stewardship. This limitation on the common law privilege is grounded in public policy and is well within the legislative power.[3]

---

[3] Some of the target cases, cited above, involved public officials or employees. However, they were all decided prior to enactment of the present statute in 1970.

See for example *N. J. S. A.* 2A:84A–17(4) which embodied a restriction on the common law privilege against self-incrimination in New Jersey extending back to *Parker v. State,* 61 *N. J. L.* 308 (Sup. Ct. 1897), affirmed 62 *N. J. L.* 801 (E. & A. 1899). Under it, if an accused in a criminal action did not testify after direct evidence was received of facts which tended to prove some element of the crime and which facts, if untrue, the accused could disprove by his own testimony, counsel and the judge could comment on the accused's failure to testify, and the trier of fact was permitted to draw an inference that the accused could not truthfully deny those facts.

This statute and the rule of law it expressed ultimately were held to be unconstitutional in *State v. Lanzo,* 44 *N. J.* 560 (1965) but only because the United States Supreme Court had held that the Fifth Amendment privilege against self-incrimination in the United States Constitution, made applicable to the states through the due process clause of the Fourteenth Amendment, forbade either comment by the prosecution on the accused's silence or instructions by the court that such silence was evidence of guilt. *Griffin v. State of California,* 380 *U. S.* 609, 85 *S. Ct.* 1229, 14 *L. Ed.* 2d 106 (1965).

Our conclusion is substantially that arrived at by the Appellate Division. We hold that dismissal of the first seven counts of the indictment was not required and that the immunity given defendant by *N. J. S. A.* 2A:81–17.2a2 adequately protected his Fifth Amendment rights. So far as *N. J. S. A.* 2A:81–17.2a1 *et seq.* limits defendant's common law privilege against self-incrimination in its application to a public employee who is called on to testify upon matters directly related to the conduct of his office, it has not been shown to be an improper exercise of the legislative power.

We repeat the Appellate Division's admonition that protection of defendant's Fifth Amendment rights will require that the State, at trial, have the burden of proving that the evidence it uses "is derived from a legitimate source wholly

independent" of his grand jury testimony. *Kastigar v. United States*, 406 *U. S.* 441, 460, 92 *S. Ct.* 1653, 1665, 32 *L. Ed.* 2d 212, 226 (1972). Also, for obvious reasons the count for false swearing must be tried separately from the other counts.

Affirmed.

## ADDENDUM

The foregoing opinion was written prior to May 23, 1977 decisions by the United States Supreme Court in *United States v. Wong,* —— *U, S.* ——, 97 *S. Ct.* 1823, 52 *L. Ed* 2d 231, and *United States v. Washington,* —— *U. S.* ——, 97 *S. Ct.* 1814, 52 *L. Ed.* 2d 238. Neither case is directly in point but the holdings therein merit some comment.

Wong, who was under investigation for possible criminal activity was called to testify before a grand jury. Following her testimony, she was indicted for perjury based on such testimony. On motion, the District Court ordered the testimony suppressed as evidence of perjury on the ground that no effective warning of the Fifth Amendment privilege to remain silent had been given. The Ninth Circut affirmed, 553 *F.* 2d 576 (1974). The United States Supreme Court, in a unanimous opinion reversed. Citing *United States v. Mandujuano,* 425 *U. S.* 564, 96 *S. Ct.* 1768, 48 *L. Ed.* 2d 212 (1976), it held that the Fifth Amendment grants a privilege to remain silent but "does not endow the person who testifies with a license to commit perjury." *Glickstein v. United States*, 222 *U. S.* 139, 142, 32 *S. Ct.* 71, 56 *L. Ed.* 128 (1911). In the instant case Vinegra has also been indicted for perjury based on his grand jury testimony.

In the second case, Washington was also a target of a criminal investigation. He was called before a grand jury and advised of his Fifth Amendment rights but was not told that he was a potential defendant in danger of indictment. Following his testimony, he and others were indicted for grand larceny and receiving stolen property.

Washington's motion to suppress his testimony and quash the indictment was granted by the Superior Court for the

District of Columbia on Fifth Amendment grounds. It held that the most significant failing of the prosecutor was in not advising Washington that he was a potential defendant. The District of Columbia Court of Appeals agreed and affirmed the trial court ruling insofar as it suppressed Washington's grand jury testimony as trial evidence. However, it reinstated the indictment against Washington holding that an indictment returned by a properly constituted grand jury is not subject to challenge on the ground that it was based on unconstitutionally obtained evidence. See *United States v. Calandra, supra; United States v. Blue, supra.* Washington's petition to review this portion of the Court of Appeals ruling was denied. *Washington v. United States,* 426 *U. S.* 905, 96 *S. Ct.* 2225, 48 *L. Ed.* 2d 830 (1976). However, the Government's petition to review the holding which suppressed Washington's grand jury testimony as trial evidence was granted and the decision of the Court of Appeals was reversed.

The United States Supreme Court, with Justices Brennan and Marshall dissenting, held that the comprehensive warnings which Washington had in fact received, whether or not such warnings were constitutionally required, dissipated any element of compulsion to self-incrimination. The Court also held that it was not required that Washington be warned that he was a potential defendant since a target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination and potential defendant warnings add nothing of value to protection of Fifth Amendment rights.

Suffice it to note that this holding would appear to afford a grand jury target witness considerably less protection under the Fifth Amendment privilege against self-incrimination than he receives under the common law privilege in this State. See *State v. Williams, supra,* and other cases cited on pp. 488 and 489.

HUGHES, C. J., dissenting. With all respect, I dissent from the opinion of the majority. It affirms Appellate Division reversal of the trial court decision to dismiss seven of the eight counts of an indictment returned against a subpoenaed grand jury witness, Victor Vinegra. It does not deal as fully as I would feel necessary with the rights of a "target" witness, if that witness is protected by immunity arising from the statute. The statute in effect at the time of the Vinegra indictment and its partial dismissal concerned the forced testimony of public employees. It was an immunity statute precluding the use of the witness' testimony or evidence derived therefrom in any subsequent criminal proceeding, thus seeking to balance the needs of the State's investigatory power and the valuable testimony which a public employee might give, as against the individual's privilege against compulsory self-incrimination. *Kastigar v. United States*, 406 *U. S.* 441, 92 *S. Ct.* 1653, 32 *L. Ed.* 2d 212 (1972) ; *Garrity v. New Jersey*, 385 *U. S.* 493, 87 *S. Ct.* 616, 17 *L. Ed.* 2d 562 (1967).

Notwithstanding the statute and the supposed sufficiency of the immunity it confers upon the public employee witness, from the use of such compelled testimony and its derivatives against him in a later criminal proceeding, I believe that the rights of this defendant were so abused that such remedy is insufficient and that the trial court dismissal of the counts referred to was entirely justified.

New Jersey courts from the earliest times have been zealous to protect an important common law right — that of free men to be shielded from compulsory self-incrimination. "The privilege of a witness against being compelled to incriminate himself, of ancient origin, is precious to free men as a restraint against high-handed and arrogant inquisitorial practices." *State v. Fary*, 19 *N. J.* 431, 434 (1955). *See also State v. Deatore*, 70 *N. J.* 100, 113 & n. 8 (1976) ; *State v. Zdanowicz*, 69 *N. J. L.* 619, 622 (E. & A. 1903) ; *Fries v. Brugler*, 12 *N. J. L.* 79, 82 (Sup. Ct. 1830). *See generally* 8 *Wigmore, Evidence* § 2250 (McNaughton rev. 1961).

In *Fary,* Justice Brennan, writing for this Court, recalled that:

Decisions outside our State apparently agree that a failure to warn the witness of his right to assert the privilege is fatal to an indictment if the grand jury indicts the witness after questioning him about specific criminal charges made against him in a formal way, as by a criminal complaint. * * * The same result is reached even as to a witness not under formal criminal charges if it is made unmistakably to appear that the grand jury was actually conducting an investigation directed against the witness and summoned him to testify with the purpose of getting evidence to fix a criminal charge on him. The rationale of these decisions is that where the investigation is in fact a proceeding against the witness, or being ostensibly a general investigation is, in fact, as shown by the circumstances in evidence, a proceeding against him, then there is a gross encroachment upon the witness' privilege if he be subpoenaed before the body, sworn and questioned, though he makes no claim of the privilege. * * * Chief Justice Case implied, in *State v. Grundy,* 136 *N. J. L.* 96, 98 (Sup. Ct. 1947), that the burden of the indicted witness is to show that *"there was a ruse by which it was sought to induce [the witness], unwittingly, to give evidence against himself."* Any doubt in that regard, under the prevailing view, is resolved in favor of the validity of the indictment and the treatment of the indicted witness as merely an ordinary witness who waived the privilege by not claiming it. [*State v. Fary, supra,* 19 *N. J.* at 437–38 (citations omitted) (emphasis added)].

But no such doubt is apparent in the present case, for the Appellate Division left undisturbed, as obviously should we, the trial court determination of the *factum* of such prosecutorial ruse[1] and its relationship to the appearance of Vinegra before the grand jury.

---

[1] "Our review of the record indicates that there was sufficient evidence to justify the factual conclusions of the trial judge that Vinegra was a target of the grand jury investigation; that he was not informed of the scope of the investigation or of his privilege against self-incrimination, and that calling him before the grand jury was a ruse to obtain evidence against him." *State v. Vinegra,* 134 *N. J. Super.* 432, 436 (App. Div. 1975).

The trial court noted that after the disclosure in the civil case mentioned by the Appellate Division, and later conferences with the

The focal question raised by this appeal is not to ascertain whether a fundamental wrong was done (essentially admitted on all sides) but rather to determine what should be its consequence, and that in the aspect not only of basic constitutional right but of rights and principles imbedded in the common law. One pauses here to note that in New Jersey there has been no judicial hesitancy in going beyond naked constitutional right as defined by the United States Supreme Court.[2] There have been recognized in our jurisdiction other and broader rights, seen as judicially enforceable, which have sometimes been described as responsive to a New Jersey "fairness and rightness" doctrine. *See State v. Johnson,* 68 *N. J.* 349, 353 (1975); *Avant v. Clifford,* 67 *N. J.* 496, 520–21 (1975); *Donaldson v. Board of Ed. of No. Wildwood,* 65 *N. J.* 236, 243 (1974); *Rodriguez v. Rosenblatt,* 58 *N. J.* 281, 294 (1971); *Monks v. New Jersey State Parole Bd.,* 58 *N. J.* 238, 246 (1971); *White v. Parole Board,* 17 *N. J. Super.* 580, 586 (App. Div. 1952).

In applying that doctrine in the present circumstance, our scrutiny should extend to the power and responsibility of both grand jury and prosecuting attorney; the rights of the public employee "target" witness called before the grand jury; and the just and necessary impact upon those rights of the acknowledged public need for investigative access to

---

prosecutor, a grand jury subpoena was served on Vinegra on the spot commanding him to appear before the grand jury the following day at 9 a.m., which he did without consultation with an attorney.

The sequence of other events involved in the "ruse" identified by the trial court was described by the Appellate Division. *Id.* at 434–35.

2In *State v. Deatore,* 70 *N. J.* 100, 112 (1976), in another self-incrimination context, we observed:

[A]s a matter of State law and policy, * * * we may impose standards more strict than required by the federal Constitution, which standards will control regardless of the final outcome of the question in the federal sphere.

the ramifications of official wrongdoing, in support of which need the immunity statutes were enacted.

## THE GRAND JURY

In our present system the grand jury is a powerful instrument of government. Its deliberations are secret, and its members officers of the court exercising judicial functions, and therefore immune from civil responsibility for their official acts, *O'Regan v. Schermerhorn, 25 N. J. Misc. 1* (Sup. Ct. 1946). Its role is hybrid in the sense that it acts for the people not only in the exercise of its investigative, indictment and presentment power, but just as importantly in defense of the citizen as to whom it finds no probable or just cause to hold to trial by an indictment or expose to public denunciation by a presentment.

While its accusatory role is the more publicly noticed, its function to shield the citizen's rights became apparent very early in its history. The grand jury system can be traced at least as far back as 1166 when its forerunner operated as an arm of the English Crown. The early grand jury was responsible for reporting to the Crown on any major crimes of which the members had knowledge. From its inception as a body for accusation, the grand jury slowly evolved into a protector which acted to shield individuals from unfounded Royal prosecutions.

In 1667 a court held that grand jurors ought not be fined or imprisoned for failure to return a true bill desired by the King. *The King v. Windham, 84 Eng. Rep.* 113 (K. B. 1667). However, the two treason cases of *The Trial of Stephen Colledge, at Oxford, for High Treason,* 8 How. St. Tr. 550 (1681), and *Proceedings at the Old-Bailey upon a Bill of Indictment for High Treason, against Anthony Earl of Shaftesbury,* 8 How. St. Tr. 759 (1681), are recognized as the beginnings of the grand jury shielding function. In both cases the grand jury returned the Bill of Indictment with "ignoramus" (we ignore it) inscribed upon it, thus refusing to find a true bill.

"Many of the colonies utilized the grand jury in their struggle with England. Through it they could frustrate royal authority and prevent criminal prosecution. * * * The grand jury's image as a public protector against despotism was furthered by a colonial grand jury's refusal to indict Peter Zenger for criminal libel after his newspaper attack upon New York's English Governor." Note, "Grand Juries," 7 *Seton Hall L. Rev.* 484, 489 & n. 43 (1976).

Recognizing the necessary day-by-day assistance provided it by the prosecuting attorney, the law nevertheless intends a clear autonomy for the grand jury, as well said by our Appellate Division in *State v. Hart,* 139 *N. J. Super.* 565, 567–68 (1976):

> A grand jury has wide latitude to make inquiry into violations of the criminal law. The scope of it[s] powers reflects its special function to insure fair and effective law enforcement. The proceedings before it are not adversary in nature in which the guilt or innocence of an accused is determined. As provided by *R.* 3:6–1 *et seq.,* it functions as an independent body with very broad powers. Its hearings are held in secret and only the prosecuting attorney, interpreters when needed, a stenographer and the grand jury clerk may be present while it is in session. No person other than the clerk and the prosecuting attorney may be present when the grand jury is deliberating. It may even request the clerk and the prosecuting attorney to leave the jury room during its deliberations.
>
> The grand jurors are instructed by the assignment judge of each county that the prosecutor will present the evidence to them but that if they need further instructions they should advise the assignment judge thereof through their foreman or clerk. We recognize that there is no impropriety in the prosecutor assisting in the investigation and examination of witnesses; in advising the grand jury as to the admissibility of evidence and the proper mode of procedure and in explaining the testimony with reference to the law of the case.
>
> * * * [W]hile a prosecutor may assist the grand jury in the general manner above outlined, he may not participate in its deliberations, or express his views on questions of fact, or comment on the weight or sufficiency of the evidence, or in any way attempt to influence or direct the grand jury in its findings — rather, the grand jury must act independently of any outside source. The basic principle involved was succinctly expressed in *United States v. Dionisio,* 410 *U. S.* 1, 93 *S. Ct.* 764, 35 *L. Ed.* 2d 67 (1973):

The Fifth Amendment guarantees that no civilian may be brought to trial for an infamous crime "unless on a presentment or indictment of a Grand Jury." This constitutional guarantee presupposes an investigative body "acting independently of either prosecuting attorney or judge," *Stirone v. United States*, 361 *U. S.* 212, 218, 80 *S. Ct.* 270, 273, 4 *L. Ed.* 2d 252, whose mission is to clear the innocent, no less than to bring to trial those who may be guilty. [at pp. 16–17, 93 S. Ct. at p. 773].

The integrity of such grand jury independence must be defended whether it is impinged upon mistakenly or from honest zeal, as was apparently the case in *Hart,* or whether it is interfered with at the hands of an inordinately aggressive or politically ambitious and publicity conscious prosecuting attorney. I do not suggest either postulate in the present matter, but only mention the contrasting motivations to indicate that in either case the legal result is exactly the same — the corruption of the whole process, perilous alike to the citizen and to the administration of justice. New Jersey courts have held it essential that free men be held to answer to the law for infamous crime only on indictment by a grand jury, acting independently on its own conscience—and not as a mere receptacle for formal evidence, parroting in its factual decisions the wishes of any other, whether prosecutor or judge. Such is the concept of the common law, and the pure stream of justice would be tainted were this independence to be weakened. In such eventuality, as in *Hart,* the product of such encroachment, an indictment thus wrongfully induced, should be aborted by judicial action, without prejudice, ordinarily, to a re-presentment to another grand jury.

Nor is it realistic to doubt that the grand jury process needs continuing judicial surveillance. It would be naive to depend today upon the viability of the truism stated in 1955 by Justice Brennan in *Fary* :

It doubtless is not, as it should not be, the practice of our prosecutors and grand juries to summon witnesses whose indictment is contemplated. [*State v. Fary, supra,* 19 *N. J.* at 436].

.

One need not go beyond the present record to justify skepticism on this point.

It is not to be expected that the lay citizens who comprise a grand jury be sophisticated as to all the elements of constitutional or basic law. Nor, in further explication of the juror's oath of office (taken at the organization of the grand jury[3]) should it be necessary for the Assignment Judge to forewarn the jury to anticipate (much less, how to deal with) instances where rights under constitutional and common law protection are apt to be overrun — as by the production before it of a witness, ostensibly only that, but in truth a known and intended target for indictment — as in the present case.

Grand jurors upon being empaneled are generally charged by the Assignment Judge that the evidence respecting violations of the criminal law will be presented to them in the privacy of the grand jury room by the prosecuting attorney "whose experience and assistance you will have." So it is that the grand jury begins its service with a sense of reliance upon the prosecuting attorney, even though its members are reminded in the Assignment Judge's charge of the essential autonomy of the grand jury to which I have referred. I think it not amiss to speculate that the grand jury, at least at this stage and without knowing intimately the multitude of judicial precedents which have so described him, visualizes the prosecuting attorney as a minister of justice, as interested

---

[3]You as members of this grand inquest to sit in behalf of the State of New Jersey [in this county] do solemnly swear that you will support the Constitution of the United States and the Constitution of this State * * * and that you shall diligently inquire and true presentment make of all such matters and things as shall be given you in charge, or in any way come to your knowledge touching the present service; that the counsel of the State and your own counsel you shall keep secret; that you shall present no one through envy, hatred or malice; neither shall you leave any one unpresented for fear, favor or affection, for reward, gain or the hope thereof; but that you shall present all things truly as they come to your knowledge, according to the best of your skill and understanding * * *. [N. J. S. A. 2A:73-3].

in protecting the innocent, unjustly suspected or accused, as he is in seeking by indictment an avenue of prosecution of the guilty.[4] This leads to a consideration of what the law and the public expect of the prosecuting attorney.

## THE PROSECUTING ATTORNEY

The county prosecutor is a constitutional officer. *N. J. Const.* (1947), Art. VII, § II, par. 1. Of prosecutors it has been said variously that a public prosecutor is a quasi-judicial officer, retained by the public for the prosecution of persons accused of crimes; that his constitutional office is held as a public trust, and the incumbent is charged with grave responsibilities calling for the exercise of learning in the law and sound judgment; that the United States Attorney and his assistants are officers of the court, holding quasi-judicial positions, and it is their recognized duty, not only to prosecute the guilty but also to protect the innocent; that the district attorney represents the commonwealth and the commonwealth demands no victims, it seeks justice only — equal and impartial justice; that in the trial of a criminal case the code of ethics of the district attorney cannot too closely follow the ethics of the bench; that a prosecutor should not act as a partisan eager to convict but as an officer of the court, whose duty it is to aid in arriving at the truth in every case; that his object, like that of the court, should be simply justice and to see that the criminal laws of the

---

[4] One would think this confidence not misplaced, as to the vast majority of prosecutors, if only by considering the large proportion of grand jury matters "no-billed," that is to say where after consideration of evidence the grand jury decides not to return an indictment. This percentage in Middlesex County over the past five years, for instance, has amounted to approximately 50 percent of the complaints coming into the prosecutor's office and presented by him to the grand jury. This lends circumstantial support to the belief that most prosecuting officials regard themselves not as "persecutors" but prosecutors in the high professional and quasi-judicial sense I shall describe.

state are honestly and impartially administered; that he holds a position analogous to that of the judge who presides at the trial; that he is not a mere legal attorney, but a sworn minister of justice; that the district attorney who permits his zeal to secure convictions to cause him to disregard his duty as a sworn minister of justice not only wrongs the defendant, but impedes the administration of criminal justice and brings the administration of criminal law into disrepute. *See United States v. Jones,* 140 *U. S. App. D. C.* 1, 433 *F.* 2d 1107, 1108 (D. C. Cir. 1970); *Griffin v. United States,* 295 *F.* 437, 439–40 (3d Cir. 1924); *State v. Spano,* 64 *N. J.* 566, 568 (1974); *Appeal of Nicely,* 130 *Pa.* 261, 18 *A.* 737, 738 (1889); *O'Neill v. State,* 189 *Wis.* 259, 207 *N. W.* 280–81 (1926); *Ex Parte Bentine,* 181 *Wis.* 579, 196 *N. W.* 213, 216 (1923). *See also State v. Winne,* 21 *N. J. Super.* 180, 200–01 (Law Div. 1952), *rev'd* 12 *N. J.* 152 (1953).

In *Berger v. United States,* 295 *U. S.* 78, 88, 55 *S. Ct.* 629, 633, 79 *L. Ed.* 1314, 1321 (1935), it was noted that the prosecutor represents the state, whose interest "is not that it shall win a case, but that justice shall be done. * * * [W]hile he may strike hard blows, he is not at liberty to strike foul ones." In *Giles v. Maryland,* 386 *U. S.* 66, 100, 87 *S. Ct.* 793, 810, 17 *L. Ed.* 2d 737, 759 (1967), it was stated: "A criminal trial is not a game in which the State's function is to outwit and entrap its quarry. The State's pursuit is justice, not a victim." (Fortas, J., concurring.) The American Bar Association Canons of Professional Ethics, No. 5, provides: "The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done."

Instances of egregious prosecutorial error or excesses continue to come under judicial scrutiny. They are sometimes seen, however wrong they are, as inconclusive or of minor effect in the face of overwhelming trial evidence of guilt, excusable reaction to defense provocation, and the like. *See Dunlop v. United States,* 165 *U. S.* 486, 498, 17 *S. Ct.* 375, 379, 41 *L. Ed.* 799, 803 (1897); *State v.*

*Perry,* 65 *N. J.* 45, 54 (1974); *State v. DiPaglia,* 64 *N. J.* 288, 297 (1974).

In other cases they require judicial reversal of the trial convictions to which they were incident, in vindication of essential justice. *See State v. Carter,* 69 *N. J.* 420, 434 (1976); *State v. Spano, supra,* 64 *N. J.* at 568; *State v. Farrell,* 61 *N. J.* 99, 104–06 (1972); *State v. Taylor,* 49 *N. J.* 440, 455–56 (1967); *State v. Siciliano,* 21 *N. J.* 249, 262–63 (1956); *State v. Sims,* 140 *N. J. Super.* 164, 176 (App. Div. 1976).

It would be unrealistic to assume that such prosecutorial lapses are, in the main, evilly intended. More likely most are due to inexperience, mistake, the excitement of trial, zeal for the conviction of the supposedly guilty and like understandable human factors. Here again, it is not the purpose but the consequence which is important. It is that consequence, and its impact on constitutional and common law rights, that deserve preeminent consideration in terms of judicial remedy. With each uncorrected violation of such rights, the ideals of American justice are affronted and diminished. The Court must therefore, in the public interest, measure remedy to wrong, if these ideals are to survive.[5]

---

[5]The relationship among the strong remedy of dismissal, prosecutorial conduct, and fundamental fairness, notwithstanding *Kastigar,* has been noticed in the federal courts. The Second Circuit held in *United States v. Hinton,* 543 *F.* 2d 1002, 1010 (1976) that:

> We believe that as a matter of fundamental fairness, a Government practice of using the same grand jury that heard the immunized testimony of a witness to indict him after he testifies, charging him with criminal participation in the matters being studied by the grand jury, cannot be countenanced. The procedure is so fraught with applicable constitutional problems and with the potential for abuse that in our supervisory power over the administration of criminal justice in the district courts of this circuit, *cf. United States v. Toscanino,* 500 *F.* 2d 267 (2d Cir. 1974), we are compelled to conclude that the procedure the Government adopted here falls outside the bounds of permissible· prosecutorial conduct. Accordingly, we reverse the conviction of

Sincere prosecutorial zeal, a sense of mission, no doubt inspired those who confronted "heresy" at the Inquisitions and those who sought out "treason" at the Star Chamber. But first Englishmen, and then Americans, wanted to make sure that such zeal be contained in its impact on human freedom and civilized relationships. Hence the recognition at the common law of individual freedom; hence the centuries-old independence of the citizen grand jury; hence the barriers to injustice erected by the Fifth Amendment, and other provisions of our Constitution.

One recalls statements made long ago by great judges who foresaw the implications and cost of excessive prosecutorial zeal. In *Olmstead v. United States,* 277 *U. S.* 438, 470, 48 *S. Ct.* 564, 575, 72 *L. Ed.* 944, 953 (1928), Justice Holmes, dissenting, said:

We have to choose, and for my part I think it a less evil that some criminals should escape than that the Government should play an ignoble part.

For those who agree with me, no distinction can be taken between the Government as prosecutor and the Government as judge. If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such iniquities to succeed.

In the same case, Justice Brandeis mentioned:

Applying to the Fourth and Fifth Amendments the established rule of construction, the defendants' objections to the evidence obtained by wire-tapping must, in my opinion, be sustained. * * * [I]t is * * * immaterial that the intrusion was in aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding. [*Id.* at 479, 48 *S. Ct.* at 572–73, 72 *L. Ed.* at 956–57 (footnote omitted)].

---

· appellant Hinton and instruct that the indictment be dismissed as to her. [footnote omitted].

In our system of government, by happy inheritance from our ancestors, there exist polestars, Constitution and common law, to guide us on the way, and to secure human freedom and justice. All prosecuting attorneys must be, and I believe most of them are, full participants in this process.

## STATES' POWER TO IMPOSE "HIGHER STANDARDS" THAN REQUIRED BY FEDERAL CONSTITUTION

I think the recent decisions of the United States Supreme Court in *United States v. Wong*, —— U. S. ——, 97 S. Ct. 1823, 52 L. Ed. 2d 231 (1977) and *United States v. Washington*, —— U. S. ——, 97 S. Ct. 1814, 52 L. Ed. 2d 238 (1977) do not add much to the majority rationale here — unless our Court would now abandon its willingness, as evidenced by many of the cases cited *supra*, to impose a higher standard when construing rights granted by state law than has been mandated by the United States Supreme Court with respect to federal constitutional rights.

The Court held in *Wong* that testimony given by a grand jury target witness who was effectively not advised of her privilege against self-incrimination should not be suppressed as evidence of perjury. Although Vinegra was indicted for false swearing as a result of his grand jury testimony, that count of the indictment was not dismissed by the trial judge, and its validity *vel non* is thus not before us on this appeal. We leave to another day the determination of whether the result in *Wong* would be appropriate under New Jersey law.

In *Washington* the Supreme Court held that a grand jury witness who was warned generally of his Fifth Amendment rights, had no right to be warned that he was a "target" of the grand jury investigation. The question for us is whether this holding does, or should, control our decision here.

This Court has recognized that while the United States Supreme Court's determinations of federal constitutional law are binding on this court, "each state has the power to impose higher standards * * * under state law than is required by the Federal Constitution." *State v. Johnson, supra,* 68 *N. J.* at 353. This basic principle of federalism has been acknowledged on many occasions by the United States Supreme Court. *See, e. g., Oregon v. Hass,* 420 *U. S.* 714, 719, 95 *S. Ct.* 1215, 1219, 43 *L. Ed.* 2d 570, 575–76 (1975); *Lego v. Twomey,* 404 *U. S.* 477, 489, 92 *S. Ct.* 619, 627, 30 *L. Ed.* 2d 618, 627 (1972); *Sibron v. New York,* 392 *U. S.* 40, 60–61, 88 *S. Ct.* 1889, 1901–02, 20 *L. Ed.* 2d 917, 933–34 (1968); *Cooper v. California,* 368 *U. S.* 58, 62, 87 *S. Ct.* 788, 791, 17 *L. Ed.* 2d 730, 734 (1967); *Johnson v. New Jersey,* 384 *U. S.* 719, 733, 86 *S. Ct.* 1772, 1781, 16 *L. Ed.* 2d 882, 892 (1966). *See also United States v. Washington, supra,* —— *U. S.* at ——, 97 *S. Ct.* 1814 (Brennan, J., dissenting); *Michigan v. Mosley,* 423 *U. S.* 96, 120, 96 *S. Ct.* 321, 334, 46 *L. Ed.* 2d 313, 331 (1975) (Brennan, J., dissenting).

The majority in *Washington, supra,* seemed to nod in the direction of an informed or "free willed" voluntariness as a condition to valid self-incrimination:

Although it is well settled that the Fifth Amendment privilege extends to grand jury proceedings, *Counselman v. Hitchcock,* 142 *U. S.* 547, 12 *S. Ct.* 195, 35 *L. Ed.* 1110 (1892), it is also axiomatic that the Amendment does not automatically preclude self-incrimination, whether spontaneous or in response to questions put by government officials. "It does not preclude a witness from testifying voluntarily in matters which may incriminate him," *United States v. Monia,* 317 *U. S.* 424, 427, 63 *S. Ct.* 409, 410, 87 *L. Ed.* 376 (1943), for "those competent and *freewilled* to do so may give evidence against the whole world, themselves included." *United States v. Kimball,* 117 *F.* 156, 163 (C. C. S. D. N. Y. 1902) * * *. [—— *U. S.* at ——, 97 *S. Ct.* at 1818 (emphasis added)].

The court held, however, that "[t]he constitutional guarantee is only that the witness be not *compelled* to give self-incriminating testimony. The test is whether, considering

the totality of the circumstances, the free will of the witness was overborne." *Id.* (emphasis by the Court).

Although the question of the constitutional necessity of *Miranda*-type witness warnings was left open, the Supreme Court in *Washington* specifically held that the "target" status of a grand jury witness is constitutionally irrelevant:

Because target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential defendant warnings add nothing of value to protection of Fifth Amendment rights. [—— *U. S.* at ——, 97 *S. Ct.* at 1820].[6]

Justice Brennan, joined by Justice Marshall, dissented:

The general rule that a witness must affirmatively claim the privilege against compulsory self-incrimination must in my view admit of an exception in the case of a grand jury witness whom the prosecutor interrogates with the express purpose of getting evidence upon which to base a criminal charge against him. In such circumstances, even warnings before interrogation of his right to silence do not suffice. The privilege is emptied of substance unless the witness is further advised by the prosecutor that he is a potential defendant. * * * [—— *U. S.* at ——, 97 *S. Ct.* at 1821].

In this context Justice Brennan recalled his dissent in *United States v. Mandujano,* 425 *U. S.* 564, 598–600, 96 *S. Ct.* 1768, 1787–88, 48 *L. Ed.* 2d 212, 235–36 (1976):

I would hold that, in the absence of an intentional and intelligent waiver by the individual of his known right to be free from compulsory self-incrimination, the Government may not call before a grand jury one whom it has probable cause — as measured by an objective standard — to suspect of committing a crime, and by use of judicial compulsion compel him to testify with regard to that crime. In the absence of such a waiver, the Fifth Amendment requires that any testimony obtained in this fashion be unavailable to the Government for use at trial. Such a waiver could readily

---

[6]The prosecutorial "ruse" identified as to Vinegra (*supra*) was apparently absent in Washington's case, for the majority commented in the latter that "[t]here is no evidence of governmental misconduct which undermined the fairness of the proceedings." [—— *U. S.* at —— n. 6, 97 *S. Ct.* at 1820, n. 6].

be demonstrated by proof that the individual was warned prior to questioning that he is currently subject to possible criminal prosecution for the commission of a stated crime * * *. [footnotes omitted].

Having pointed out that Washington had not been advised of his status as a target for prosecution, Justice Brennan went on to say:

The ancient privilege of a witness against being compelled to incriminate himself is precious to free men as a shield against highhanded and arrogant inquisitorial practices. It has survived centuries of controversies, periodically kindled by popular impatience that its protection sometimes allows the guilty to escape punishment. But it has endured as a wise and necessary protection of the individual against arbitrary power, and the price of occasional failures of justice is paid in the larger interest of general personal security. I would hold that a failure to warn the witness that he is a potential defendant is fatal to an indictment of him when it is made unmistakably to appear, as here, that the grand jury inquiry became an investigation directed against the witness and was pursued with the purpose of compelling him to give self-incriminating testimony upon which to indict him. * * * [—— *U. S. at* ——, 97 *S. Ct.* at 1821–1822].

This view would seem consistent with our Court's approach to waiver in *State v. Johnson, supra,* wherein we departed from the *Schneckloth*[7] rationale by holding:

[T]he validity of a consent to search * * * must be measured in terms of waiver; i. e., where the State seeks to justify a search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element of which is *knowledge of the right to refuse consent.* [68 *N. J.* at 353–54 (emphasis added)].

---

[7]"In *Schneckloth v. Bustamonte,* 412 *U. S.* 218, 93 *S. Ct.* 2041, 36 *L. Ed.* 2d 854 (1973) the United States Supreme Court held that where the subject of a search is not in custody and the state attempts to justify the search on the basis of consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied, and that while knowledge of a right to refuse consent is one factor to be taken into account, it is not an indispensable element of an effective consent. 412 *U. S.* 248–249, 93 *S. Ct.* 2041." [*State v. Johnson, supra,* 68 *N. J.* at 352].

I would hold, consistent with *Johnson,* that knowledge of "target" status is an essential element for a valid informed waiver.

## THE PUBLIC EMPLOYEE "TARGET" WITNESS

The State does not suggest that Vinegra's privilege against self-incrimination was not violated. It argues only that dismissal is an inappropriate remedy and that he is entitled only to suppression of the evidence and fruits thereof obtained in violation of his privilege, should the State attempt to use the same at trial. The entitlement of the defendant to that suppression is clear and as noted by the trial judge, the immunity in that sense is self-executing and automatic:

By the clear language of the statute, the legislature intended to negate the existence of any requirement that the privilege be asserted by a witness before a grant of immunity. The immunity becomes automatic once the witness is called and testifies before the grand jury unless there is a knowing and intelligent waiver.

In considering whether the remedy of suppression of evidence is sufficient, I am aware of the rule in the federal courts that use and derivative use immunity is co-extensive with Fifth Amendment rights and therefore compatible with the United States Constitution. *Kastigar v. United States, supra; Zicarelli v. New Jersey State Comm'n of Investigation,* 406 *U. S.* 472, 92 *S. Ct.* 1670, 32 *L. Ed.* 2d 234 (1972).

Nor am I suggesting the barring of prosecution altogether, as would have been the result had the United States Supreme Court not reversed the United States District Court dismissal of the indictment in *United States v. Blue,* 384 *U. S.* 251, 86 *S. Ct.* 1416, 16 *L. Ed.* 2d 510 (1966). There the tainted evidence originated outside the grand jury process, but the Court suggested that even if it had occurred therein "our precedents indicate this would not be a basis for abating the prosecution pending a new indictment, let

alone barring it altogether. *See Costello v. United States,* 350 *U. S.* 359, 76 *S. Ct.* 406, 100 *L. Ed.* 397; *Lawn v. United States,* 355 *U. S.* 339, 78 *S. Ct.* 311, 2 *L. Ed.* 2d 321; 8 Wigmore, Evidence § 2184a, at 40 (McNaughton rev. 1961)." 384 *U. S.* at 255 n. 3, 86 *S. Ct.* at 1419, 16 *L. Ed.* 2d at 514. It confined the remedy for *Blue* to suppression of the evidence and its derivatives, if sought to be used against him at trial. And as to "barring the prosecution altogether" it held:

So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to the book. [*Id.* at 255, 86 *S. Ct.* at 1419, 16 *L. Ed.* 2d at 515].

My view here does not advocate "so drastic a step" as transactional immunity, nor an end to the prosecution itself, but merely its abatement by dismissal of the tainted indictment. I am aware, too, of the suggestion by the State that the legal result ought to be affected by the possible intervening running of the statute of limitations, and the associated burden of re-presentment. But here that statute had not run when the trial judge dismissed the indictment, and the matter readily could have been re-presented to another grand jury; and in any event the "false swearing" count of the indictment survives, that offense not being immunized by the statute and no challenge being offered to the refusal to dismiss it.

In the case of a "target" witness in general, public employee or not, whose rights against self-incrimination are violated in the *Fary* sense, as by the "ruse" established in this case, I would regard dismissal and re-presentment, in the typical situation, as "relatively costless" (*Avant v. Clifford, supra,* 67 *N. J.* at 543) and a salutary remedy suggested by the New Jersey "fairness and rightness" doctrine. It would stem the evils of careless prosecutorial error or invidious prosecutorial excess, against which we have inveighed so frequently. It would vindicate and support the

common law right against self-incrimination. It would vacate the tainted portion of the indictment. It would recognize that an indictment, to the citizen, means more than exposure to criminal trial and punishment. It amounts also to public disgrace, the shattering of a reputation into ruins, recovery from which, notwithstanding the presumption of innocence and further events is, realistically, well nigh impossible. Accordingly, I would nullify the Appellate Division doubts as to Justice Brennan's assumption in *Fary*, and its disapproval out of hand of the relevant holdings of various trial courts (*State v. Sarcone,* 96 *N. J. Super.* 501 (Law Div. 1967); *State v. Rosania,* 96 *N. J. Super.* 515 (Law Div. 1967); *Stale v. Sibilia,* 88 *N. J. Super.* 546 (Law Div. 1965)).

## *CONCLUSION*

For the reasons set forth, I would reverse the decision of the Appellate Division and reinstate the trial court's dismissal of the first seven counts of the indictment.

PASHMAN, J., dissenting.

## I

## *THE NEED FOR ADEQUATE SAFEGUARDS*

The procedures used by the government to prosecute the defendant in this case underscore the necessity for adequate safeguards to protect a witness's privilege against self-incrimination.

Defendant Victor Vinegra's allegedly illegal activities as Assistant City Engineer for the City of Elizabeth initially came to light during civil litigation involving a claim for work and materials furnished in connection with a city road and sewer project. Following his testimony in that trial, an attorney for one of the defendant corporations informed the trial judge in chambers that the defendant had requested

and received a $500 political contribution from his client prior to the start of work on the project.

The trial judge then invited the prosecutor to join the discussion. The Appellate Division summarized the events which occurred thereafter as follows:

> On the following day Vinegra was called before the grand jury then sitting in the county. Prior to his giving testimony he was told that penalties for perjury or obstruction of justice would be invoked for failure to give complete and truthful testimony. He was not warned, however, that anything he said might be used against him, nor was he advised of his privilege against self-incrimination or of his right to counsel. Vinegra was questioned about his role in the road and sewer project. He was asked whether he had recommended a contractor for the project, whether he made personal inspections of the project, how often he visited the project site, whether additional stone was used on the project, the methods of financing the project and the procedures for paying the contractors. He was also asked to explain his supervision of the record keeping for the stones delivered and the $500 political contribution. Vinegra appeared before the grand jury on three subsequent occasions. Ultimately a nine-count indictment was returned by the grand jury charging defendant Vinegra individually with two counts of misconduct in office and one of false swearing. Together with one Harry E. Allen he was charged with three counts of conspiracy, one count of false pretenses and one count of attempted false pretenses. The ninth count charged Allen with false swearing.
> [*State v. Vinegra*, 134 N. J. Super. 432, 435 (1975).]

Defendant appeared before the grand jury on four occasions within the space of two months.[1] He was one of 22 witnesses to appear. Despite the severity of the potential sanctions which the defendant faced, he did not consult with an attorney prior to appearing before the grand jury.

The trial court made findings of fact which were upheld by the Appellate Division — that defendant was a target of the grand jury investigation; that he was not informed of the scope of the investigation or of his privilege against self-incrimination; and that calling him before the grand

---

[1] His initial appearance was on January 24, 1973. He was called back to testify on January 31, February 7 and March 21, 1973.

jury was a prosecutorial ruse to induce him to give evidence against himself. 134 *N. J. Super.* at 436. Yet in spite of these factual determinations, the Appellate Division and the majority refuse to accept the trial judge's legal conclusion that seven of the eight counts in the indictment should be dismissed.

The majority today holds that even where a target witness is compelled to testify under a grant of immunity, the same grand jury which heard his compelled testimony may indict him for the acts about which he was questioned; the only protection which his immunity provides is that all evidence derived from his grand jury testimony may not be used at trial. It also holds that a target witness who is compelled to testify under a grant of immunity need not be informed of the scope of the grand jury investigation, of his right to counsel or of the nature of his immunity.

The majority pays scant heed to the trilemma facing the defendant on the four occasions he was called to testify before the grand jury. First, if he chose to remain silent, as a public employee he could have been removed from his employment for not testifying and cited for contempt, *N. J. S. A.* 2A:81-17.2a1. Second, if he admitted committing the illegal acts, he could have been fired from his position, *N. J. S. A.* 2A:81-17.2a3. More important, he could have been indicted for the crimes about which he testified *by the same grand jury hearing his compelled testimony,* even though *N. J. S. A.* 2A:81-17.2a2 states that "such testimony and the evidence derived therefrom shall not be used against such public employee in a subsequent criminal proceeding under the laws of this State." Third, if the witness testified falsely, then in addition to being indicted for the acts about which he was questioned, he could have been prosecuted for false swearing, *N. J. S. A.* 2A:81-17.3, as he was here.

While the foregoing predicament stemmed primarily from defendant's inability to tell the truth without incriminating

himself, I believe that the State's methods were objectionable and fundamentally unfair. Defendant was told that if he did not give complete testimony he would be cited for obstruction of justice. But he was never told that if he did testify, the authorities would have been compelled to confer on him an automatic grant of immunity which would have precluded using the compelled testimony or its fruits to convict him at trial. To withhold this information from a witness who was not represented by counsel, while simultaneously informing him that failure to testify fully will subject him to criminal charges, creates an unsavory inducement to lie. In my view, the State has no valid interest in deliberately capitalizing on a witness' ignorance and virtually inviting this sort of illegal act.

Moreover, even where a witness is fully informed of the scope of the grand jury inquiry and his full rights, I believe today's decision fails to accord him the protection guaranteed by the privilege against self-incrimination. Assuming *arguendo* that the use immunity provided by *N. J. S. A.* 2A:81–17.2a2 offers protection which is co-extensive with the privilege against self-incrimination,[2] see *infra* at 522 *et seq.* (Pashman, J., dissenting), it is intolerable to permit indictment of an immunized witness by the same grand jury which heard his compelled testimony.

---

[2] Use immunity prevents the prosecution or the government from utilizing the testimony obtained from the defendant and its direct or indirect fruits in any subsequent prosecution. It does not, however, prevent prosecution of the witness where the evidence marshalled against the accused has been obtained from an independent source. Transactional immunity, by contrast, forbids prosecuting the witness for any transaction related to the compelled testimony. *See generally*, Note, "Standards for Exclusion in Immunity Cases after Kastigar and Zicarelli," 82 *Yale L. J.* 171 (1972) ; Note, "The Fifth Amendment's Proxy — Transactional or Use Immunity?", 3 *Seton Hall L. Rev.* 199 (1971) ; Note, "Immunity Statutes and the Constitution," 68 *Colum. L. Rev.* 959 (1968).

## A
## *Adequate Warnings*

It is undisputed that the sole purpose of the grand jury proceedings was to marshall sufficient evidence for a criminal indictment against defendant. The sequence of events, beginning with the private revelation in judicial chambers of misconduct and continuing through the initiation of proceedings the following day, clearly demonstrates that defendant was the focal point of the investigation from the outset. The entire procedure "was a ruse by which it was sought to induce the [witness], unwittingly, to give evidence against himself." *State v. Grundy,* 136 *N. J. L.* 96, 98 (Sup. Ct. 1947).

By failing to inform the defendant that his admissions could not be used against him, the authorities allowed him to believe that his choice was between self-incrimination and perjury. Rather than allow the State to place a putative defendant in such a predicament, I would require that adequate warnings be given to such a witness, whether or not he is obligated to speak in exchange for a grant of immunity. Where he is compelled to testify, he should be informed of his status and the protections which he will receive under a grant of immunity.

While it may not be necessary under the Federal Constitution to warn a grand jury witness that he is a putative defendant, *see United States v. Washington,* —— *U. S.* ——, 97 *S. Ct.* 1814, 52 *L. Ed.* 2d 238 (1977),[3] such a requirement

---

[3] In *United States v. Washington,* the Court held that a grand jury witness who is informed of his Fifth Amendment privilege may not have his grand jury testimony suppressed at trial because he was not informed that he was the target of the grand jury inquiry. The Court reserved the question of whether Fifth Amendment warnings are constitutionally required for grand jury witnesses. —— *U. S.* at ——, 97 *S. Ct.* 1814. Justice Brennan, in dissent, noted that the majority's decision did not affect the authority of state courts "to give the individual greater protection than is provided" by the Fifth Amendment, citing *State v. Johnson,* 68 *N. J.* 349, 353 (1975). —— *U. S.* at ——, 97 *S. Ct.* 1814.

is necessary to protect the privilege against self-incrimination and is warranted under the State Constitution. The majority is apparently willing to concede that where a putative defendant has the right to remain silent he should be informed both of his status before the grand jury and his rights; it even notes that it has "in numerous decisions approved this principle, * * * and [t]rial courts have uniformly adhered to the . . . rule." See *ante* at 488. In such cases it concedes that the appropriate remedy is dismissal of the indictment. *Id.* However, it then concludes that where, as here, the witness is a public employee, authorities are not required to give him any warnings because he is compelled to speak in exchange for a grant of immunity.[4]

This conclusion rests on the premise that the state privilege against self-incrimination, and hence any procedures necessary to protect that right, may be diminished by legislative action. I disagree. The privilege against self-incrimination is one of the fundamental liberties embedded in our American system of justice. It was characterized by the Supreme Court in *Boyd v. United States,* 116 *U. S.* 616, 6 *S. Ct.* 524, 29 *L. Ed.* 746 (1886), as one of the "principles of a free government." 116 *U. S.* at 632, 6 *S. Ct.* at 533, 29 *L. Ed.* at 751. In *Miranda v. Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed.* 2d 694 (1966), the Court called the privilege "one of our Nation's most cherished principles," 384 *U. S.* at 457–58, 86 *S. Ct.* at 1619, 16 *L. Ed.* 2d at 714, and said:

---

[4]The majority's decision fortunately has a limited scope, applying only to public employees who testified prior to October 8, 1975 under the former "self-executing" version of *N. J. S. A.* 2A:81–17.2a2. As it points out in footnote 1, the 1975 amendments limit grants of immunity to situations in which the public employee testifies after having been informed that failure to appear will subject him to removal, and then invokes the privilege against self-incrimination. Under this revised scheme, I would anticipate that the target witness doctrine would be fully applicable.

[T]he privilege against self-incrimination — the essential mainstay of the American adversary system — is founded on a complex of values, . . . All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government — state or federal — must accord to the dignity and integrity of its citizens.

[384 *U. S.* at 460, 86 *S. Ct.* at 1620, 16 *L. Ed.* 2d at 715]

Other opinions stressing the overriding importance of this guarantee to a fair trial are too numerous to mention.

The Fifth Amendment privilege against self-incrimination is applicable to the States through the Fourteenth Amendment. *Malloy v. Hogan,* 378 *U. S.* 1, 84 *S. Ct.* 1489, 12 *L. Ed.* 2d 653 (1964). While textually our State Constitution makes no reference to the privilege against self-incrimination, it certainly is one of our most basic rights; it is so fundamentally woven into the fabric of our criminal justice system that it must be regarded as within the absolute rights incorporated into *N. J. Const.* (1947), Art. I, ¶1. *State v. Miller,* 67 *N. J.* 229, 242 (1975) (Pashman, J., dissenting).[5] Hence, I cannot share the majority's view that the existence of such an important right as the privilege against self-incrimination can be diminished by legislative action.

Nor do I believe that adequate warnings would conflict with the legislative policy expressed in the public employee immunity statute. My conclusion in this regard is strengthened by the "Grand Jury Manual for Prosecutors: Criminal Justice Standards," which was recently prepared by the Office of the Attorney General and the County Prosecutors Association. *5 Criminal Justice Quarterly,* 18 (1977). Specifically referring to the type of witness involved in this case — a pub-

---

[5] In *State v. Fary,* 19 *N. J.* 431 (1954), after tracing the history of the privilege, Mr. Justice Brennan stated: "[a]lthough not written into our State Constitution, . . . the privilege has been firmly established in New Jersey since our beginnings as a State." 19 *N. J.* at 435. See generally, *State v. Zdanowicz,* 69 *N. J. L.* 619 (E. & A. 1903); *State v. Miller,* 71 *N. J. L.* 527 (E. & A. 1905); *Fries v. Brugler,* 12 *N. J. L.* 79 (Sup. Ct. 1830); *In re Vince,* 2 *N. J.* 443 (1949); *In re Pillo,* 11 *N. J.* 8 (1952).

lic employee-target witness — the report concludes that the prosecuting attorney must advise the public officer as follows:

1. That he is a public officer or employee within the meaning of *N. J. S. A.* 2A:81–17.2(a)[2a] *et seq.;*
2. That pursuant to that Act, he has the duty to appear and to testify upon matters directly related to the conduct of his public position;
3. That if he fails to appear and to testify, he is subject to removal from office pursuant to that Act;
4. That if he does give testimony pursuant to this inquiry, neither that testimony nor anything derived from that testimony can be used against him in a subsequent criminal prosecution except for perjury or false swearing.
5. That if he declines to provide testimony, in addition to any action the court may take in the nature of contempt, he is subject to removal from office for his refusal to provide testimony pertaining to the conduct of his office; and
6. That if he admits the commission of a misdemeanor or high misdemeanor relating to his public employment, office or position, he is subject to removal from office.

As in the case of target warnings, these advisements should be placed on the record (although there is no reason that this particular proceeding cannot occur in the grand jury). The public officer should be questioned as to his understanding of the advisements and his opportunity to consult with counsel as well.

[*Id.* at 26–27][6]

## B

## IMMUNITY

I also disagree with the majority's conclusion that the same grand jury which hears a target witness' compelled testimony may subsequently use that information to return an indictment against him. This is a patent violation of the defendant's constitutional rights, requiring dismissal of the first seven counts of the indictment against him.

---

[6]While these warnings are discussed in relation to the new act, and need be given only after a witness has claimed the privilege, see *ante* at 515, n. 3 (Pashman, J., dissenting), there is no reason to assume that the Legislature intended a witness to receive less protection under the preexisting statute simply because immunity was automatically conferred upon him.

In effect, the majority holds that a grand jury may use the pain of contempt to coerce a public employee to testify and then indict him on charges stemming from the facts about which he was questioned. The only remedy which the majority would provide is suppression of the compelled testimony at trial.[7] *See ante* at 491. I believe that this remedy is constitutionally inadequate under both Federal and State Constitutions.

Since, as the majority notes, the statute only precludes using a witness' compelled testimony in a "subsequent" criminal proceeding, see *ante* at 490, it must be concluded that the statute itself is unconstitutional under *Kastigar v. United States,* 406 *U. S.* 441, 92 *S. Ct.* 1653, 32 *L. Ed.* 2d 212

---

[7]The majority apparently assumes that suppression of the evidence at trial, and not dismissal of the indictment, is all that is required under *United States v. Calandra,* 414 *U. S.* 338, 94 *S. Ct.* 613, 38 *L. Ed.* 2d 561 (1974) and *United States v. Blue,* 384 *U. S.* 251, 86 *S. Ct.* 1416, 16 *L. Ed.* 2d 510 (1966). They intimate no such holding. Indeed, in *Calandra* the Court expressly distinguished its decision from a situation where the violation of defendant's privilege was committed in the grand jury room by that body through its agent and representative, the prosecutor. Justice Powell, writing for the Court, stated:

[The grand jury] may consider incompetent evidence, but it may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law. * * * Although, for example, an indictment based on evidence obtained in violation of a defendant's Fifth Amendment privilege is nevertheless valid, * * * the grand jury may not force a witness to answer questions in violation of the constitutional guarantee. Rather, the grand jury may override a Fifth Amendment claim only if the witness is granted immunity co-extensive with the privilege against self-incrimination.

[414 *U. S.* at 346, 94 *S. Ct.* at 619, 38 *L. Ed.* 2d at 570] Lower federal courts have emphasized the distinction between an indictment by a grand jury which merely considered unconstitutionally obtained evidence and an indictment by a grand jury which was itself responsible for the constitutional violation. *See Jones v. United States,* 119 *U. S. App. D. C.* 284, 342 *F.* 2d 863, 872 (D. C. Cir. 1964) (en banc) (Edgerton, Bazelon, Fahy, Wright, J.J., concurring) ; *In re Weir,* 495 *F.* 2d 879 (9 Cir.), *cert.* den. 419 *U. S.* 1038, 95 *S. Ct.* 525, 42 *L. Ed.* 2d 315 (1974).

(1972), *reh.* den. 408 *U. S.* 931, 92 *S. Ct.* 2478, 33 *L. Ed.* 2d 345 (1972).[8] That case made it clear that *any* use of testimony which was compelled under an immunity statute would be unconstitutional. Justice Powell, writing for the majority declared that "use immunity" "provides a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom." 406 *U. S.* at 460, 92 *S. Ct.* at 1664, 32 *L. Ed.* 2d at 226. Referring expressly to the grand jury proceeding in *United States v. Dionisio,* 410 *U. S.* 1, 93 *S. Ct.* 764, 35 *L. Ed.* 2d 67 (1973), the Court stated:

> This is not to say that a grand jury subpoena is some talisman that dissolves all constitutional protections. The grand jury cannot require a witness to testify against himself.
> [410 *U. S.* at 11, 93 *S. Ct.* at 770, 35 *L. Ed.* 2d at 78.]

Contrary to the statement in *Kastigar* that "[t]his *total prohibition* on use provides a comprehensive safeguard,"

---

[8]The Second Circuit's decision in *United States v. Hinton,* 543 *F.* 2d 1002 (2 Cir. 1976), squarely addresses this question. There the defendant challenged her indictment on the ground that she was indicted by the same grand jury which heard her immunized testimony. After noting that the procedure failed to comply with *Kastigar,* the Court held:

> We believe that as a matter of fundamental fairness, a Government practice of using the same grand jury that heard the testimony of a witness to indict him after he testifies, charging him with criminal participation in matters being studied by the grand jury, cannot be countenanced. The procedure is so fraught with applicable constitutional problems and with the potential for abuse that in our supervisory power over the administration of criminal justice . . . , we are compelled to conclude that the procedure the Government adopted here falls outside the bounds of permissible prosecutorial conduct.
> [543 *F.* 2d at 1010]

*See also, Goldberg v. United States,* 472 *F.* 2d 513, 516 (2 Cir. 1973) (dictum) (stating that *Kastigar* would prohibit compelling an immunized witness to testify before a grand jury seeking to indict him) ; *In re Liddy,* 165 *U. S. App. D. C.* 254, 506 *F.* 2d 1293, 1306 (D. C. Cir. 1974) (quoting *Goldberg*).

*id.* (emphasis added), the State's action in this case left the defendant as vulnerable at the grand jury stage as he would have been if the privilege against self-incrimination had been abolished altogether. This absurd result wipes out, at least in New Jersey, a considerable part of what was once proudly considered to be "an important advance in the development of our liberty." *Kastigar v. United States,* 406 *U. S.* at 444, 92 *S. Ct.* at 1656, 32 *L. Ed.* 2d at 216.

Furthermore, the majority's decision cannot be predicated on the fact that the defendant's testimony contained no directly prejudicial evidence of the crimes for which he was indicted; the indictment must be dismissed regardless of the substance of his testimony. As Judge Waterman pointed out in *United States v. Hinton,* 543 *F.* 2d 1002 (2 Cir. 1976), the presence of other damaging evidence before the grand jury does not establish that the basis for an indictment derives from a "wholly independent" source when the same grand jury considers the defendant's compelled testimony.

A juror can draw an inference of a witness's guilt from either a confirmation of, or a denial of participation in, acts about which he is questioned. For instance, if witness X denies involvement in a situation in which one or several other witnesses have already confirmed X's participation, the jurors could reasonably draw an inference that X had not truthfully testified about the incident. Distrust of his testimony on that one point could reasonably lead the jurors to distrust all or a large part of X's testimony on other matters. If witness X had kept silent, or had been permitted to assert his Fifth Amendment privilege, those negative inferences would have been precluded.

[543 *F.* 2d 1009.]

*See also Albertson v. Subversive Activities Control Bd.,* 382 *U. S.* 70, 81, 86 *S. Ct.* 194, 15 *L. Ed.* 2d 165 (1965) (holding that the incriminating effect of coerced information is not mitigated by the Government's assertions that it was of "no utility" to them).

## II

## THE CONSTITUTIONAL RIGHT TO TRANSACTIONAL IMMUNITY

### A

*Providing An Adequate Safeguard For The Privilege*

The use and fruits immunity which is sanctioned both by the public employee immunity statute, *N. J. S. A.* 2A:81–17.3, and by the United States Supreme Court in *Kastigar v. United States, supra,* fails to adequately protect a witness' right not to incriminate himself. I regard the majority's willingness to uphold defendant's indictment in this case as further proof of the need for greater safeguards for the privilege.

Immunity statutes are intended to safeguard a witness' privilege by precluding the incriminating effect of the words which he may be compelled to utter. This is the sole basis for their constitutionality. In *Kastigar* the Supreme Court carefully noted the importance of the Fifth Amendment interests protected by immunity statutes. After outlining the power of government to compel a witness to testify, the Court stated:

> But the power to compel testimony is not absolute. There are a number of exemptions from the testimonial duty, the most important of which is the Fifth Amendment privilege against compulsory self-incrimination. The privilege reflects a complex of our fundamental values and aspirations, and marks an important advance in the development of our liberty. It can be asserted in any . . . disclosures [that] the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used. This Court has been zealous to safeguard the values that underlie the privilege.
> [406 *U. S.* at 444, 92 *S. Ct.* at 1656; footnotes omitted.]

Thus, it is well established that to adequately protect the witness' privilege against self-incrimination, any grant of immunity which is conferred upon the witness as a way of

coercing testimony must be coextensive with the scope of the privilege which it replaces. *See Kastigar v. United States, supra,* 406 *U. S.* at 449, 92 *S. Ct.* at 1658, 32 *L. Ed.* 2d at 219; *Murphy v. Waterfront Comm'n,* 378 *U. S.* 52, 54, 78, 84 *S. Ct.* 1594, 12 *L. Ed.* 2d 678 (1964); *Counselman v. Hitchcock,* 142 *U. S.* 547, 585, 12 *S. Ct.* 195, 35 *L. Ed.* 2d 1110 (1892).

In endorsing use immunity, I believe that the Supreme Court has placed its trust in an unenforceable scheme, and has substituted the good-faith compliance of government officials for the security of the privilege. In place of the constitutional guarantee, the Supreme Court has substituted a new formula — it places on the government the burden of demonstrating that incriminating evidence has been obtained independent of the compelled testimony:

This burden of proof, which we affirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.
[*Kastigar,* 406 *U. S.* at 460, 92 *S. Ct.* at 1665, 32 *L. Ed.* 2d at 226.]

The Supreme Court's formula for accommodating the interests of the State and the witness simply cannot provide as effective a guarantee that a witness' words will not be used against him as the Constitution has given us. First, the Court's reliance on allocating the burden of proof ignores the realities of the fact-finding process; in fact, there is no quantum of proof which could be available to sustain this burden. Even assuming the good-faith of prosecuting officials, the prosecutor may not even know how he arrived at certain incriminating evidence. His job often requires him to piece together fragments of information, each particle of data supplying various inferences which may affect the weight to be given other facts. Dissenting in *Kastigar,* Justices Marshall and Brennan refuted this notion of an "independent source." Justice Marshall argued that

even . . . [the] good faith [of prosecuting officials] is not a sufficient safeguard.

For the paths of information through the investigative bureaucracy may well be long and winding, and even a prosecutor acting in the best of faith cannot be certain that somewhere in the depths of his investigative apparatus, often including hundreds of employees, there was not some prohibited use of the compelled testimony.

[406 *U. S. at* 469, 92 *S. Ct.* at 1669, 32 *L. Ed.* 2d at 231][9]

In addition to outlining the "uncertainties of the fact-finding process," Justice Brennan has shown that these concerns are substantial, particularly when it is the same jurisdiction which is responsible for both compelling a witness to testify and for subsequently prosecuting him. Arguing in favor of transactional immunity, he said:

&#42;   &#42;   &#42;   For one thing, all the relevant evidence will obviously be in the hands of the government — the government whose investigation included compelling the individual involved to incriminate himself. Moreover, this argument does not depend upon assumptions of misconduct or collusion among government officers. It assumes only the normal margin of human fallibility. Men working in the same office or department exchange information without recording carefully how they obtained certain information; it is often impossible to remember in retrospect how or when or from whom information was obtained. By hypothesis, the situation involves one jurisdiction with presumably adequate exchange of information among its various law enforcement officers. Moreover, the possibility of subtle inferences drawn from action or nonaction on the part of fellow law enforcement personnel would be difficult if not impossible to prove or disprove.

[*Piccirillo v. New York*, 400 *U. S.* 548, 567–68, 91 *S. Ct.* 520, 530, 27 *L. Ed.* 2d 596 at 609 (1971) (Brennan, Marshall, JJ., dissenting from order dismissing writ of certiorari as improvidently granted) ; Citation omitted.]

---

[9] *See* also, *In re Kinoy*, 326 *F. Supp.* 407, 418 (S. D. N. Y. 1971) :

Any independent source would be greatly illuminated by the prior testimony. The determination, in the first instance, to seek an independent source would often flow from an admission of guilt or from the questions and the nature of the responses.

Apart from the vagaries of the fact-finding process, the availability of a witness' testimony may furnish the government with valuable aids which may never be displayed as part of the proof at trial. Justice Brennan has described one such advantage which the State may obtain as enabling the "investigation to generate enough steam and continue long enough to produce 'independent evidence incriminating the individual originally compelled to testify.'" *Id.*, 400 *U. S.* at 567, 91 *S. Ct.* at 530, 27 *L. Ed.* 2d at 609. In determining how to allocate investigatory resources, a prosecutor will undoubtedly be influenced to follow up crimes disclosed by a witness. Furthermore, a witness' testimony gives the prosecutor the luxury of doing away with the detective's art of theorizing how a crime took place; his testing ground for hypotheses becomes the witness stand. *See* Note, "The Supreme Court, 1971 Term," 86 *Harv. L. Rev.* 1, 187, n. 37 (1972); *Rules of Criminal Procedure, supra.* Comment at 345–46.

The Supreme Court in *Kastigar* failed to comment upon the effect that use immunity can have when combined with other prosecutorial techniques. Though the defendant would clearly have the right to take the stand and testify in any criminal prosecution, he may be deterred from doing so for fear that his prior compelled testimony may undermine his credibility. This may be true even though there are no blatant discrepancies in his testimony; the mere fact that he has been required to repeat his version of the facts several times gives the prosecutor an opportunity to argue that minor deviations are indicative of a fabrication. Moreover, if there are contradictions, it is not clear whether the Supreme Court would allow the prosecutor to *use* the compelled testimony as a way of impeaching the defendant's credibility.[10] Such a result would reduce to a mockery the

---

[10]This result is certainly left open by the decisions in *Harris v. New York*, 401 *U. S.* 222, 91 *S. Ct.* 643, 28 *L. Ed.* 2d 1 (1971) and *State v. Miller*, 67 *N. J.* 229 (1975), holding that the prosecutor

Court's assertion that use immunity puts the defendant in the same situation he would have been in if he had exercised his Fifth Amendment right to remain silent prior to trial.

Perhaps one of the more subtle, yet equally devastating, uses of the defendant's testimony is described by Chief Judge Seitz, concurring in *United States ex rel. Catena v. Elias*, 449 *F.* 2d 40 (3 Cir. 1971):

> The prosecutor is obviously in a position to tailor his questions, consciously or otherwise, on the basis of his knowledge of the defendant's prior testimony and can do so without any overt reference to the testimony given under immunity. In these circumstances, could defense counsel effectively object on the ground that the immunity grant was thereby violated? I think not. Indeed, how could a trial judge do other than accept the prosecutor's representation, which might well be in good faith, that the questions were not inspired by the testimony given by the defendant under immunity? Furthermore, this same possibility may adversely influence a defendant to forego entirely his right to testify in his own behalf even though he is advised that his prior disclosures cannot be used against him.
>
> [449 *F.* 2d at 45.]

Finally, the Supreme Court's characterization of the burden of proof will do little to ameliorate the effects of use immunity which have been described. Although it has stated that the burden imposed upon prosecuting officials is not "limited to a negation of taint," more likely the burden will consist of little more than the government's denial that it has used the witness' testimony against him. Justice Marshall's dissenting opinion in *Kastigar* demonstrates the magnitude of this problem:

> [T]he information relevant to the question of taint is uniquely within the knowledge of the prosecuting authorities. They alone

---

may use a defendant's prior illegally obtained statement for impeachment purposes at trial. See Dershowitz & Ely, "*Harris v. New York*: Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority," 80 *Yale L. J.* 1198, 1223 (1971); *Rules of Criminal Procedure* (10 U. L. A.), rule 732, comment at 345.

are in a position to trace the chains of information and investigation that lead to the evidence to be used in a criminal prosecution. A witness who suspects that his compelled testimony was used to develop a lead will be hard pressed indeed to ferret out the evidence necessary to prove it. And of course it is no answer to say he need not prove it, for though the Court puts the burden of proof on the government, the government will have no difficulty in meeting its burden by mere assertion if the witness produces no contrary evidence. The good faith of the prosecuting authorities is thus the sole safeguard of the witness' rights.

[406 *U. S.* at 469, 92 *S. Ct.* at 1669, 32 *L. Ed.* 2d at 231.][11]

*See also, Rules of Criminal Procedure* (10 U. L. A.) rule 732, comment at 343–44; Mansfield, "The Albertson Case: Conflict Between the Privilege Against Self-Incrimination and the Government's Need for Information," 1966 *Sup. Ct. Rev.* 103, 165; Note, "The Unconstitutionality of Use Immunity: Half a Loaf is not Enough," 46 *So. Calif. L. Rev.* 202, 208 (1972).

Once again, other procedural advantages accorded the prosecutor may effectively neutralize the protections intended under use immunity. The prosecutor's discretion to refuse to disclose the names of its informants is one example. *See McCray v. Illinois,* 386 *U. S.* 300, 87 *S. Ct.* 1056, 18 *L. Ed.* 2d 62 (1967) (due process clause or right of confrontation not violated by state's refusal to disclose identity of informant whose testimony supported warrantless arrest and incidental search); *State v. Milligan,* 71 *N. J.* 373 (1976) (disclosure of informant's identity not required unless essential to defendant's preparation of his defense). While the Supreme Court has not discussed the applicability of the state's privilege to refuse to disclose the names of its informants, if the government could assert that its

---

[11]Similarly, it has been asserted that:

To say that a witness can successfully rebut the Government's proof that its source is untainted is to be naive about the imbalance which daily attends the resources of Government as opposed to those of the average defendant in a criminal case.

[*In re Kinoy, supra,* 326 *F. Supp.* at 419]

"independent source" is an unnamed informant, this would make any enforcement of the prohibition against using compelled testimony totally illusory.[12]

## B

### *The Historical Justification for Transactional Immunity*

Though the United States Supreme Court has steadfastly reaffirmed the principle that the protections of a grant of immunity must be coextensive with the guarantees embodied in the privilege against self-incrimination, in *Kastigar,* the Court departed from an unbroken line of Supreme Court precedents and held that a witness may be provided with use, as opposed to transactional, immunity where he is compelled to testify. The strong historical support for transactional immunity, as well as the inability of use immunity to adequately protect a witness, persuade me that this Court should offer greater protection to an immunized witness under State law than is currently offered under Federal guarantees.

An analysis of the Supreme Court's treatment of immunity must begin with *Counselman v. Hitchcock, supra.* In that case the Court struck down the Immunity Act of 1868, 15 Stat. 37, and concluded that because the statute "could not . . . prevent the use of [a witness'] testimony to search out other testimony to be used in evidence against him," it failed to adequately safeguard a witness' Fifth Amendment rights. Significantly, the Court stated:

> We are clearly of opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating

---

[12]In *Morss v. Forbes,* 24 *N. J.* 341, 360 (1957), it was noted that disclosure of the contents of an informant's communication may also be incidental to the Government's privilege. As applied to the present problem, if the Government could lawfully refuse to disclose what precise information its independent source at trial provided, the defendant would have no way of telling whether the Government had sufficient independent evidence to sustain a conviction.

question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. [The immunity statute under consideration] does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the constitutional provision, *a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates.*

> [142 *U. S..* at 585–86, 12 *S. Ct.* at 206, 35 *L. Ed.* at 1122; emphasis added.]

Whether the opinion in *Counselman* is correctly characterized as *dictum* or as holding, in *Brown v. Walker,* 161 *U. S.* 591, 16 *S. Ct.* 644, 40 *L. Ed.* 819 (1896), the Court clearly indicated that transactional immunity was constitutionally required. In ruling upon the constitutionality of a federal transactional immunity statute which it found was "supposed to have been passed in view of the opinion . . . in *Counselman,*" it is significant that the Court never even considered use immunity; its discussion was limited to debating whether transactional immunity was unconstitutional. The majority found that "a statute absolutely securing to him such immunity from prosecution would satisfy the demands of the clause. . . ." Four of the Justices dissented, arguing that even transactional immunity was not coextensive with the privilege. *See Brown v. Walker, supra* (Shiras, J., dissenting; Field, Gray, White, JJ., dissenting). *See also, Ullmann v. United States,* 350 *U. S.* 422, 440, 76 *S. Ct.* 497, 100 *L. Ed.* 511, 525 (1956) (Douglas, Black, JJ., dissenting) (expressing the same view), *reh.* den. 351 *U. S.* 928, 76 *S. Ct.* 777, 100 *L. Ed.* 2d 1457 (1956).

The fact that four justices in *Brown* were unwilling to accept any type of immunity as a substitute for the guarantees of the privilege leads to the conclusion that the Court would have unanimously held a use immunity statute to be unconstitutional. The logical effect of the holding in *Brown* was noted by the court in *In Re Kinoy,* 326 *F. Supp.* 407, 414 (S. D. N. Y. 1971): "[i]f the 'absolute

immunity' from prosecution language in *Counselman* was mere *dictum,* it took on new life in *Brown v. Walker . . .* as settled doctrine." [Citation and footnote omitted.]

Consistent with the broad language in *Counselman* and its application in *Brown,* until recently the Supreme Court had expressed its unwavering adherence to the requirement of transactional immunity. *See Albertson v. Subversive Activities Control Bd., supra* (applying the standards enunciated in *Counselman* to conclude that the immunity statute under consideration was not complete) ; *Reina v. United States,* 364 *U. S.* 507, 514, 81 *S. Ct.* 260, 264, 5 *L. Ed.* 2d 249, 255 (1960) ("in safeguarding him against future federal and state prosecutions 'for or on on account of any transaction, matter or thing concerning which he is compelled' to testify, the statute grants him immunity fully coextensive with the constitutional privilege") ; *Smith v. United States,* 337 *U. S.* 137, 146, 69 *S. Ct.* 1000, 1005, 93 *L. Ed.* 1264, 1271 (1949) ("Through *Counselman . . .* it was established that absolute immunity from federal criminal prosecution for offenses disclosed by the evidence must be given a person compelled to testify after claim of privilege against self-incrimination.") ; *United States v. Monia,* 317 *U. S.* 424, 428, 63 *S. Ct.* 409, 411, 87 *L. Ed.* 376, 380 (1943) (approvingly citing *Counselman* for the proposition that "nothing short of absolute immunity would justify compelling the witness to testify if he claimed his privilege") ; *United States v. Murdock,* 284 *U. S.* 141, 149, 52 *S. Ct.* 63, 65, 76 *L. Ed.* 210, 313 (1931) ("The principle established is that full and complete immunity against prosecution by the government compelling the witness to answer is equivalent to the protection furnished by the rule against compulsory self-incrimination.") ; *Hale v. Henkel,* 201 *U. S.* 43, 67, 26 *S. Ct.* 370, 376, 50 *L. Ed.* 652, 662 (1906) (finding that the "extent of this immunity [required to satisfy the Fifth Amendment] was fully considered by this court in *Counselman . . .*," leading to the passage of the immunity statute upheld in *Brown v. Walker, supra*).

Thus, prior to *Kastigar,* the Supreme 'Court had consistently advocated transactional immunity.[13] For instance, in 1965 the Court decided *Albertson v. Subversive Activities Control Bd., supra,* wherein it considered a federal statute requiring members of certain groups to comply with its registration requirements. Although the statute provided that the registered information would not be used as a violation of any criminal statute, including the criminal provisions of the Subversive Activities Act of 1950, or "be received in evidence" against a registrant in any criminal prosecution, the Court found it to be fatally defective. Justice Brennan, writing for the Court, declared:

In *Counselman v. Hitchcock,* . . . , decided in 1892, the Court held "that no [immunity] statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege . . . ," and that such a statute is valid only if it supplies "a complete protection from all the perils against which the constitutional prohibition

---

[13]In *Murphy v. Waterfront Commission,* 378 *U. S.* 52, 84 *S. Ct.* 1594, 12 *L. Ed.* 2d 678 (1964), the Court extended the protections under immunity statutes by holding that a witness answering questions under a grant of state immunity had to be given use immunity by federal officials seeking to prosecute him. Although this holding indicates that immunity need not be absolute in every instance, it squarely extended prior Supreme Court decisions concerning the sufficiency of immunity. Authorities suggest that any authorization of use immunity in *Murphy* was based primarily upon principles of federalism and hence its endorsement of use immunity is limited to the interjurisdictional setting. *Kastigar v. United States, supra,* 406 *U. S.* at 463, 92 *S. Ct.* at 1666, 32 *L. Ed.* 2d at 228 (Douglas, J. dissenting) ; *Piccirillo v. New York,* 400 *U. S.* 548, 562, 91 *S. Ct.* 520, 27 *L. Ed.* 2d 596, 605 (1971) (cert. dismissed as improvidently granted) (Brennan, Marshall, JJ., dissenting) ; *United States ex rel. Catena v. Elias,* 449 *F.* 2d 40, 44 (3 Cir. 1971) ("Analytically, the Murphy decision is a reaffirmation of the adequacy of transactional immunity . . ."). Note, "Standards for Exclusion in Immunity Cases after *Kastigar* and *Zicarelli,*" 52 *Yale L. J.* 171, 173 (1972). But see, *In re Zicarelli,* 55 *N. J.* 249, 268–69 (1970), aff'd 406 *U. S.* 472, 92 *S. Ct.* 1670, 32 *L. Ed.* 2d 234 (1972).

was designed to guard . . ." by affording "absolute immunity against future prosecution for the offence to which the question relates." [382 *U. S.* at 80, 86 *S. Ct.* at 199, 15 *L. Ed.* 2d at 172; citations omitted.]

Yet in *Kastigar*, eighty years after its decision in *Counselman*, the Court found use immunity to be constitutional. Justice Powell stated that "[t]he constitutional inquiry, rooted in logic and history, as well as in the decisions of this Court, is whether the immunity granted under this statute is coextensive with the scope of the privilege." 406 *U. S.* at 449, 92 *S. Ct.* at 1659, 32 *L. Ed.* 2d at 219; footnote omitted. Nevertheless, unpersuaded by prior case law, the Court announced that a grant of use and derivative use immunity "is sufficient to compel testimony over a claim of the privilege." 406 *U. S.* at 453, 92 *S. Ct.* at 1661, 32 *L. Ed.* 2d at 222.

Justice Powell's opinion in *Kastigar* is predicated on its finding that "[t]he broad language in *Counselman* . . . was unnecessary to the Court's decision, and cannot be considered binding authority." 406 *U. S.* at 454–455, 92 *S. Ct.* at 1662, 32 *L. Ed.* 2d at 223. In a footnote the Court attempted to distinguish the long list of cases adhering to transactional immunity:

language similar to the Counselman dictum can be found in Brown v. Walker, . . . and Hale v. Henkel, . . . Brown and Hale, however, involved statutes that were clearly sufficient to supplant the privilege against self-incrimination, as they provided full immunity from prosecution 'for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence . . . .' . . . The same is true of Smith v. United States, . . . and United States v. Monia, . . . In Albertson v. Subversive Activities Control Board, . . . some of the Counselman language urged upon us by petitioners was again quoted.
[406 *U. S.* at 455, n. 39, 92 *S. Ct.* at 1662, 32 *L. Ed.* 2d at 223, n. 39.]

It continued by attempting to distinguish language in *Adams v. Maryland*, 347 *U. S.* 179, 74 *S. Ct.* 442, 98 *L. Ed.* 608 (1954), and *United States v. Murdock, supra,* as *dictum. Id. Ullmann v. United States, supra,* it

found, had held the *Counselman* statute unconstitutional not because it failed to provide absolute immunity, but because it did not prevent the use of the compelled testimony.[14] This long list of explanations is wholly unconvincing. In fact, in no instance prior to *Kastigar* had the Court indicated that transactional immunity was not constitutionally required.

Moreover, despite the Court's suggestion in *Kastigar* that *Counselman* and its progeny were weak support for the requirement of transactional immunity, Justice Powell traced the history of federal immunity statutes noting that:

> Sixteen days after the Counselman decision, a new immunity bill was introduced . . . . The bill, which became the Compulsory Testimony Act of 1893, was drafted specifically to meet the broad language in Counselman . . . . [406 *U. S.* at 451, 92 *S. Ct.* at 1660, 32 *L. Ed.* 2d at 220.]

The Court also noted that the same language in *Counselman* served as a guide for the statute which was "the basic form for the numerous federal immunity statutes until 1970." 406 *U. S.* at 452, 92 *S. Ct.* at 1660, 32 *L. Ed.* 2d at 221. And finally, it is important to note that even after *Kastigar* was decided the drafters of the Uniform Rules of Criminal Procedure rejected use and fruits immunity, and required transactional immunity. *Uniform Rules of Criminal Procedure, supra,* at 342.

## C

### Transactional Immunity Under the State Constitution

I have previously cited the need to develop a state body of law regarding the privilege against self-incrimination.

---

[14]Because transactional immunity includes the protections of use immunity, *see Piccirillo v. New York, supra,* 400 *U. S.* at 561, 91 *S. Ct.* at 527, 27 *L. Ed.* 2d at 605, n. 6 (Brennan, J., dissenting), a statute's failure to prohibit investigatory leads which are derived from a witness' compelled testimony, whether or not related to the crime about which he testified, would violate both use and transactional immunity.

See *State v. Deatore*, 70 *N. J.* 100, 125 (1976) (Pashman, J., concurring in result and dissenting); *State v. Miller*, 67 *N. J.* 229 (1975) (Pashman, J., dissenting). Because I believe that use immunity fails to adequately protect a witness who is compelled to testify, as it did here, I would construe our State Constitution to require transactional immunity. As I have already noted, I am totally opposed to any notion that the Legislature can diminish the privilege against self-incrimination as a matter of state law. See *ante* at 517 (Pashman, J., dissenting).[15]

This Court has not previously considered whether use immunity is constitutional under our State Constitution.[16]

---

[15]Although New Jersey had statutorily adopted transactional immunity, *N. J. S. A.* 52:9M–17, in 1968 it changed to use immunity. See *N. J. S. A.* 2A:81–17.3 and a comparison of the two provisions in *In re Addonizio*, 53 *N. J.* 107 (1968). Although comparing the two statutes, Chief Justice Weintraub explicitly noted that the validity of use immunity under the Fifth Amendment was not involved in its decision. *Id.*, 53 *N. J.* at 115 n. 1. Similarly, in *State v. DeCola*, 33 *N. J.* 335 (1960) Chief Justice Weintraub touched upon the question of immunity, but failed to indicate the propriety of use immunity.

[16]Justice Brennan has stated the need for states to develop a body of law based on their own state constitutions. See Brennan, "State Constitutions and the Protection of Individual Rights," 90 *Harv. L. Rev.* 489 (1977). I believe that the instant case presents the appropriate opportunity to do so.

I am aware of this Court's decision in *In re Zicarelli*, 55 *N. J.* 249 (1970), aff'd 406 *U. S.* 472, 92 *S. Ct.* 1670, 32 *L. Ed.* 2d 234 (1972) (companion case to *Kastigar*) finding use immunity constitutionally permissible under the Fifth Amendment. Since the Court limited itself to a discussion of federal guarantees it should not be considered binding authority on state constitutional interpretations. Additionally, *this Court has impliedly approved at times the requirements of transactional immunity as a matter of state law*. In *In re Application of Waterfront Comm.*, 39 *N. J.* 436 (1963), vacated and remanded on other grounds *sub nom.*, 378 *U. S.* 52, 84 *S. Ct.* 1594, 12 *L. Ed.* 2d 678 (1964), this Court cited *United States v. Murdock, supra*, for the proposition that the State's failure to be able to afford a witness immunity from both state and federal prosecution did not defeat the state immunity statute. After quoting from *Murdock* that "full and complete immunity against prosecu-

Although in *Avant v. Clifford,* 67 *N. J.* 496 (1975) we sanctioned use immunity in certain procedures used in prison disciplinary hearings, we were concerned with a totally different problem from that which we face today. Our focus there was on the coercive effect that prison disciplinary procedures have on an inmate. We noted that he has no formal right to counsel or to freely call witnesses on his own behalf, and he may have charges sustained against him on a lesser burden of proof than in normal criminal proceedings. We concluded that, in effect, an inmate is compelled by these procedures to testify in his own behalf. 67 *N. J.* at 540. Accordingly, we held that a prisoner in such a situation is entitled to use and fruits immunity. However, that opinion can hardly be read as an endorsement of use immunity in the context of the instant case. There we were concerned with a prisoner's right to speak, and not his privilege to remain silent; nowhere did we state that use immunity granted an inmate would suffice

---

tion by the government compelling the witness to answer is equivalent to the protection furnished by the rule against compulsory self-incrimination," the Court noted that the rule had been followed in nearly all states, including New Jersey. 39 *N. J.* at 453. However, there was no suggestion that the Court was ready to adopt that principle as a matter of state constitutional law. *See also, State v. Kenny,* 68 *N. J.* 17, 33 (1975) (Clifford, J., concurring: "I understand the Court's position to be that transactional immunity is as extensive as the testimony given . . . ."). In *State v. Kenny, supra,* this Court held that a grant of transactional immunity under 18 *U. S. C.* § 2514 prohibited the State from prosecuting the defendant for charges stemming from the "transaction" about which he was compelled to testify. 68 *N. J.* at 32. Although the Court apparently relied upon the conclusion that the statutory intent required that he be granted the full dimensions of the transactional immunity granted under federal law, see *id.,* nowhere did the Court consider whether *Murphy* would have allowed the State to grant the defendant only use immunity. Significantly, the Court's reliance on lower court cases more protective of witness' rights than in *Murphy,* might be read as approving transactional immunity, even in the context of an interjurisdictional prosecution. See *ante* at 531 n. 13 (Pashman, J., dissenting).

to authorize direct government compulsion for him to testify.[17]

Consequently, I see no impediment to a decision by this Court holding that transactional immunity is required under our State Constitution. Given the fact that use and fruits immunity fails to provide adequate safeguards for a witness' rights, I regard such a result as imperative. Moreover, it would be consistent with various opinions of the United States Supreme Court ranging from 1892 until 1972.

## III

### CONCLUSION

Our constitutional guarantees presuppose overzealous prosecutors. The Supreme Court has stated that prosecutors "cannot be asked to maintain the requisite neutrality with regard to their own investigations — the 'competitive enterprise' that must rightly engage their single minded at-

---

[17]Significantly, unlike the situation confronting us today, had we taken the step of ordering transactional immunity in *Avant v. Clifford, supra,* we would have made it literally impossible to prosecute any prisoner for a crime committed while he was incarcerated. The vital distinction between that procedure and a normal prosecution is that the immunity there was conferred on any inmate who chose to testify in his own behalf. Because a prisoner has a right to take the stand, he could assert that he could not be prosecuted for any crime to which he testified. Normally, however, a public employee receives immunity only if he is required to take the stand. *N. J. S. A.* 2A:81-17.2a2. The State can refuse to grant immunity by refusing to require that the witness testify. Cf. *State v. Kenny,* 68 *N. J.* 17, 33 (1975) (Clifford, J., concurring) (need to remove access to transactional immunity from the exclusive control of the defendant).

Our decision in *Avant v. Clifford, supra,* was consistent with the Supreme Court's holding in *Simmons v. United States,* 390 *U. S.* 377, 88 *S. Ct.* 967, 19 *L. Ed.* 2d 1247 (1968), prohibiting the use of defendant's statements made during a pre-trial suppression hearing at a subsequent prosecution. *See generally,* Note, "Resolving Tensions Between Constitutional Rights: Use Immunity in Concurrent or Related Proceedings," 76 *Colum. L. Rev.* 674 (1976) and cases cited at 702-07.

tention." *Coolidge v. New Hampshire,* 403 *U. S.* 443, 450, 91 *S. Ct.* 2022, 2029, 29 *L. Ed.* 2d 564 (1970), *reh.* den. 404 *U. S.* 874, 92 *S. Ct.* 26, 30 *L. Ed.* 2d 120 (1971). An unfortunate consequence of this decision is that it sets a precedent for replacing constitutional guarantees with procedures designed to accommodate the government's interest in investigating and prosecuting crime. Though we must be sensitive to governmental interests, the Constitution never intended to place an exclusive premium on expediency. We invite abuse today by continuing a practice which gives the government free access to the most effective of all prosecutorial devices — the witness' compelled testimony.

I would find that the defendant is entitled to immunity from being prosecuted for any crime related to the testimony which he was compelled to utter.

*For affirmance*—Justices MOUNTAIN, SULLIVAN, CLIFFORD and SCHREIBER and Judge CONFORD—5.

*For reversal*—Chief Justice HUGHES and Justice PASHMAN—2.